## DeLANCEY *v.* INSURANCE CO.

In the construction of a statute, it is to be presumed that the legislature did not intend to grant to a corporation such an exemption from the operation of the general law applicable to similar corporations, as would create an unreasonable monopoly or immunity at variance with constitutional principles; and, when such an exemption is excluded by a fair construction implying the qualification that the statute is to operate in harmony with and subject to the general law, such a construction will be adopted.

Assumpsit, by Randolph A. Delancey against The Rockingham Farmers' Mutual Fire Insurance Company, on a policy of insurance dated November 19, 1866, purporting to insure the plaintiff's house, clothing, and provisions.  The facts in regard to the title of the house, and the land on which it stood, were as follows: Moses Hobbs died, seized in fee of the premises, sometime before February 24, 1866,

leaving a widow, Abby L. Hobbs; three brothers, Obed, Maurice, and James; and one sister, Abigail T. DeLancey, wife of the plaintiff, but no lineal descendants. His widow waived the provisions of the will, electing to take her share of the estate, with dower and homestead in lieu thereof; and the rights of the parties then stood as though there had been no will. February 24, 1866, Abby L., the widow, conveyed all her interest in the premises to her husband's three brothers and Mrs. DeLancey, jointly. April 6, 1866, Obed S. and Maurice conveyed their interest to the plaintiff. April 1, 1867, James conveyed his interest to the plaintiff. April 13, 1867, Mrs. Delancey conveyed her interest to Elizabeth L. Hobbs; and April 30, 1867, Elizabeth L. Hobbs conveyed to the plaintiff. Subject to the defendants' exception, the plaintiff was permitted to testify that the deed from the widow of Moses Hobbs was made to the brothers and sister in pursuance of a previous understanding of all parties, at his own suggestion, and to avoid complication; that upon the execution of that deed he paid the grantor $1,700 in cash, being the agreed price of her interest, and that the subsequent deeds, passing the legal title to himself, were all executed in pursuance and execution of a verbal contract at that time entered into;—and James Hobbs was permitted to testify that he bargained with the plaintiff to sell him his interest in his brother Moses's estate in February, 1866; that the first payment to him was made April 2, 1866, to clinch the bargain, and that $200 more was paid between that time and the last of September, 1866.

The defendants' charter provides that the directors may determine the sum to be insured on any building, not exceeding three fourths of its value. It was stipulated, in the application and policy, that the sums proposed to be insured did not exceed three fourths of the actual value of the buildings; and that the company should not be held liable to pay, in case of loss, more than three fourths of the value at the time of the loss. The value of the house, at the date of the policy, was $2,883.33; its estimated value was stated, in the application, to be $1,400; and the sum insured upon it was $1,050.

The other facts are stated in the decision.

*Marston*, for the plaintiff.

*Small & Wiggin*, for the defendants.

I. The plaintiff, not having a title in fee simple unincumbered to the property insured, and not having stated his true title, his policy is void by the terms of section 3 of the amendment to the charter. The authorities upon this point are numerous and uniform. The following are some of them: *Marshall* v. *Col. M. F. Ins. Co.*, 27 N. H. 157; *Leathers* v. *Farmers' M. F. Ins. Co.*, 24 N. H. 259; *Patten* v. *Ins. Co.*, 38 N. H. 338; *Smith* v. *Bowditch M. F. Ins. Co.*, 6 Cush. 448; *Wilbur* v. *Bowditch M. F. Ins. Co.*, 10 Cush. 446; *Falis* v. *Conway M. F. Ins. Co.*, 7 Allen 46; *Towne* v. *Fitchburg M. F. Ins. Co.*, 7 Allen 51;

*Gahagan* v. *U. M. Ins. Co.*, 43 N. H. 176. If the plaintiff had a valid contract for a conveyance, it would make no difference. See the preceding authorities. It does not satisfy the terms of the policy that he had a title in fee simple to a part. The insurance was procured upon the whole. *Wilbur* v. *Bowditch M. F. Ins. Co.*, before cited, is directly in point. The plaintiff never in fact had an unincumbered title to the land and buildings, having mortgaged them to raise the funds to complete the purchase, and the mortgage having been paid out of the funds received of the N. A. Ins. Co., as was evident from the papers in the case. The policy is void for the personal property as well as the buildings. *Friesmuth* v. *Agawam M. F. Ins. Co.*, 10 Cush. 587; *Brown* v. *People's Mutual Ins. Co.*, 11 Cush. 280. The misstatement of the title need not have been fraudulent to avoid the policy. See the preceding authorities, in all of which the principle is recognized, and in several expressly decided.

II. The policy is not saved by any statute. It is not affected by section 2, chapter 157 of the Gen. Stats., which provides " that no policy of insurance shall be avoided by reason of any mistake or misrepresentation, unless it appears to have been intentionally and fraudulently made." Charters are generally subject to amendment, and may be amended as well by general laws as by particular acts, if the intention is clear; but no amendment of a charter can amend or alter the construction of a contract made before the charter was amended. The General Statutes took effect January 1, 1868; and the policy was made November 19, 1866. This section of the General Statutes originated in an act passed July 11, 1855, which contained similar provisions, though less broad in their application, the act of 1855 being confined to cases where applications were made to agents, and the general statutes applying to all policies. If there is any conflict between the act of 1855 and the act in amendment of the charter, the act in amendment must prevail. Both derive their authority from the same source, and the act in amendment was passed at a later date, namely, June 19, 1862. *Brown* v. *Lowell*, 8 Met. 172; *Fales* v. *Whiting*, 7 Pick. 225. If both are to be construed together as parts of one act, the special act would modify the general statutes, and not the general statutes the special act. Ordinarily, specific legislation supersedes general statutes upon the particular subject of its enactment. *Ellis* v. *Swanzey*, 26 N. H. 266; *Titcomb* v. *Union M. & F. Ins. Co.*, 8 Mass. 326. A general statute does not repeal a special prior act, unless the intent is clear. *Brown* v. *Lowell*, before cited; *Tracy* v. *Goodwin*, 5 Allen 409.

The construction that a misrepresentation of title must be fraudulent to avoid a policy under section 3 of the amendment, where the application was taken by an agent, would render it practically a nullity. A fraudulent misrepresentation always avoided a policy, and, if there had been any doubt on the subject before, it is made certain by the act of 1855, by plain implication. It is a matter within everybody's knowledge, that nearly every application for insurance in home companies is made through the local agents, whose appointment is

regulated by the same act of 1855, and if misstatements of title, when made to them, must have been fraudulent to avoid a policy under this section, it could have no operation except in the rare cases where the application was made directly to the directors or secretary, and it would be very difficult to conjecture any reason why a misstatement of title to them should involve any different consequences from a misstatement to an agent.

There is no repugnancy between the act of 1855 and this section of the defendants' charter, when the true intent and purpose of each are kept in view. The charter does not contemplate that they should have any capital. It provides for borrowing to meet their losses, to save the labor and expense of too frequent assessments. Security to the assured who meet with losses, and justice to all the members, require that the company have security from each member for the payment of his assessment; and the amendment of June 19, 1862, was enacted for the specific purpose of providing such security by lien on the property insured. To make the lien effectual to give such security, the assured must have a title to the property insured, and if he have an interest sufficient to satisfy the lien, the company should know what it is; otherwise, the expense of an investigation to ascertain what it is, might exceed the assessment, and render the lien of no value practically. The amendment is remedial, and should be liberally construed to suppress the mischief and advance the remedy. A misstatement of title without fraud would impair the security by lien just as much as a fraudulent misrepresentation. The statute of 1855 was enacted for a very different purpose. Prior to that statute, a misrepresentation material to the risk, though not fraudulent, avoided a policy. The consequences of this rule were often highly penal. Where the application was made to a local agent, who was, or could make himself, fully acquainted with the risk, and upon whose judgment it was probably taken, it might be very unjust that an inadvertent misstatement of facts, open to the observation of the agent, should render the policy void. The wording of the section in the General Statutes, which is substantially a reënactment of the act of 1855, renders it clear that the mistakes and misrepresentation intended are such as affect the risk. The jury are to reduce the amount as much as the premiums should have been increased. The state of the title has nothing to do with the risk, except so far as it may induce design or negligence on the part of the assured. The title is also peculiarly within the knowledge of the applicant. See, upon this point, *Campbell* v. *M. & F. Ins. Co.*, 37 N. H. 35.

The misstatement of the title was not a mistake. The plaintiff does not claim that the application does not contain a correct statement of what he said about his title, when it states that the land and buildings were his, and unincumbered, nor that he was under the influence of any error as to what his true title was, but says the misstatement was inadvertent. It was not a misrepresentation merely, as that term is understood in insurance law, but the truth of the statements was made an express condition by the terms of the policy. *Boardman* v. *N. H.*

*Mut. Fire Ins. Co.*, 20 N. H. 551.   Prior to the statute of 1855, the law raised an implied condition that every material representation should be true ; and if any were false, the policy was made void.   The statute does away with these implied conditions, unless the misrepresentation is intentional, but does not attempt to change the effect of express conditions or warranties.

III. If, as matter of law, the defendants' charter is modified by the act of 1855, or any other statute, the plaintiff has waived the benefit of any such modification by entering into a contract to be bound by the terms and conditions of the charter as it stands.   The policy provides that said company doth promise and agree to insure the plaintiff, " subject to the provisions and conditions of the charter and by-laws of said corporation hereto annexed."   This makes the annexed charter and by-laws a part of the contract, just the same as if written in it.   *Marshall* v. *Columbian Mut. Fire Ins. Co.*, 27 N. H. 157, before cited, and authorities there cited.   The question is, then, not what would be the legal rights and obligations of members of the company in the absence of any contract ? but, what is the construction of the charter and by-laws annexed to the policy, and making a part of it, as a matter of contract ?   The act of 1855 does not make any contract of the parties illegal.   It simply declares the effect upon the contract of mistakes and misrepresentations made when the contract is entered into.   It does not prohibit the parties from making a contract, that the effect of such mistakes and misrepresentations shall be different from that declared by the act to be the effect in the absence of such a contract.   The party may release the legal liability of the company, as he might the legal liability of a common carrier, by express contract.   *Aliquis renunciare potest juri pro se introducto.*   The language of the charter cannot be misunderstood.   " Policies shall be void unless the true title of the assured, and the incumbrances on the same, be expressed therein."   " The law frequently supplies by its implications the want of express agreements between the parties, but it never overcomes by its implications the express provisions of the parties.   If these are illegal, the law avoids them.   If they are legal, it yields to them, and does not put in their stead what it would have put by implication, if the parties had been silent."   2 Par. on Con. 27.

Doᴇ, J.   In the application for insurance, signed by the plaintiff, he is made to say, among many of the things, and in the kind of print extremely difficult to be read, usually found in such documents, that he covenants and agrees that the description of the property in the application is correct, so far as regards its condition, situation, value, and risk ; that the misrepresentation or suppression of material facts, in the application, shall destroy his claim for a damage or loss; and that he holds himself bound by the charter and by-laws of the company.   The policy, after reciting, in diminutive type, in long and compact lines, that he has entered into the numerous stipulations of the application, " which is made a part of this policy," goes on to declare, in type of

good size, well spaced, and set in a legible manner, that the company, in consideration of the premises, promises to insure, subject to the provisions and conditions of the charter and by-laws " hereto annexed." Annexed to the policy, in the typographic style commonly used for the suppression of information, are copies of the defendants' act of incorporation, passed in 1833, an act in addition to that act, passed in 1862, and the by-laws.

The third section of the amendatory act of 1862 (ch. 2685), provides that " any policy of insurance issued by said company, signed by the president, and countersigned by the secretary, shall be deemed valid and binding on said company in all cases where the assured has a title in fee simple, unincumbered, to the building, buildings, or property insured, and to the land covered by said buildings; but if the assured have a less estate therein, or if the property or premises are incumbered, policies shall be void, unless the true title of the assured, and the incumbrances on the same, be expressed therein."   In the application, the plaintiff was represented as stating that the house upon which he desired insurance was his property, and was not incumbered, when he had an absolute legal title, not to the whole of the house and land covered by the house, but only to part thereof as tenant in common.   The sixth section of the act of 1855 (ch. 1662), entitled "An act in relation to insurance companies," provides that no such policy as the plaintiff's " shall be void by reason of any error, mistake, or misrepresentation, unless it shall appear to have been intentionally and fraudulently made; but said company may, in any action brought against them on said policy, file in offset any claim for damages which they shall have actually suffered thereby; and the jury may deduct, from the claims of the plaintiff, the amount of said damage, as they shall find it."   The plaintiff's misrepresentation of title was not " intentionally and fraudulently made;" and he claims that his policy is valid by force of the sixth section of the general act of 1855; while the defendants claim that the policy is void on the ground that, in cases where the assured has a less estate in the buildings insured and the land covered by the buildings than a fee simple, unincumbered, and the true title of the assured and the encumbrances are not expressed in the policy, this particular insurance company is relieved from the obligation of the sixth section of the general act of 1855, by the third section of the private act of 1862, amending its charter.

The situation of the title was such, that, if the plaintiff was not a lawyer, or a man specially versed in the legal technicalities of real estate titles, he might well have called the real as well as the personal property his, as he did when he signed the paper called an application. His " error, mistake, or misrepresentation " does not " appear to have been intentionally and fraudulently made."   The case is clearly one of the class which the general act of 1855 was intended to reach; and the plaintiff's policy is valid by force of that act, unless these defendants were singled out, among all the insurance companies of the State, as worthy of being invested with the exclusive privilege of exemption

from the operation of the general act, by the special act of 1862. Does the true construction of the latter act entitle the defendants to such an exemption?

The nature of the mischief intended to be remedied by the act of 1855 has a bearing upon the question whether, by a fair and reasonable construction, it appears that the legislature, having, in 1855, forbidden all insurance companies to commit such mischief, did actually intend, in 1862, to confer on this company the exceptional legal right to commit the same mischief. The object of the act of 1855 obviously was, to remedy an evil with which the people of this State had long believed themselves to be grievously afflicted. Whether their belief had an ample or substantial foundation, or any foundation at all; whether it was justified by the conduct of a considerable number of insurance companies; or whether the course of a very few brought an undeserved reproach upon the whole system of insurance, it is not now necessary to inquire. It is the state of things believed to exist, and not its real existence, that explains the legislation. The public belief, manifested in the annals of litigation and elsewhere, is too notorious and historic to require any specific attestation. The state of things believed to exist was this:

Some companies, chartered by the legislature as insurance companies, were organized for the purpose of providing one or two of their officers, at head-quarters, with lucrative employment,—large compensation for light work,—not for the purpose of insuring property; for the payment of expenses, not of losses. Whether a so-called insurance company was originally started for the purpose of insuring an easily earned income to one or two individuals, or whether it came to that end after a time, the ultimate evil was the same. Names of men of high standing were necessary to represent directors. The directorship, like the rest of the institution and its operations, except the collection of premiums and the division of the same among the collectors, was nominal. Men of eminent respectability were induced to lend their names for the official benefit of a concern of which they knew and were expected to know nothing, but which was represented to them as highly advantageous to the public. There was no stock, no investment of capital, no individual liability, no official responsibility,—nothing but a formal organization for the collection of premiums, and their appropriation as compensation for the services of its operators.

The principal act of precaution was, to guard the company against liability for losses. Forms of applications and policies (like those used in this case), of a most complicated and elaborate structure, were prepared, and filled with covenants, exceptions, stipulations, provisos, rules, regulations, and conditions, rendering the policy void in a great number of contingencies. These provisions were of such bulk and character that they would not be understood by men in general, even if subjected to a careful and laborious study: by men in general, they were sure not to be studied at all. The study of them was rendered particularly unattractive, by a profuse intermixture of discourses on

subjects in which a premium payer would have no interest. The compound, if read by him, would, unless he were an extraordinary man, be an inexplicable riddle, a mere flood of darkness and confusion. Some of the most material stipulations were concealed in a mass of rubbish, on the back side of the policy and the following page, where few would expect to find anything more than a dull appendix, and where scarcely any one would think of looking for information so important as that the company claimed a special exemption from the operation of the general law of the land relating to the only business in which the company professed to be engaged. As if it were feared that, notwithstanding these discouraging circumstances, some extremely eccentric person might attempt to examine and understand the meaning of the involved and intricate net in which he was to be entangled, it was printed in such small type, and in lines so long and so crowded, that the perusal of it was made physically difficult, painful, and injurious. Seldom has the art of typography been so successfully diverted from the diffusion of knowledge to the suppression of it. There was ground for the premium payer to argue that the print alone was evidence, competent to be submitted to a jury, of a fraudulent plot. It was not a little remarkable that a method of doing business not designed to impose upon, mislead, and deceive him by hiding the truth, practically concealing and misrepresenting the facts, and depriving him of all knowledge of what he was concerned to know, should happen to be so admirably adapted to that purpose. As a contrivance for keeping out of sight the dangers created by the agents of the nominal corporation, the system displayed a degree of cultivated ingenuity, which, if it had been exercised in any useful calling, would have merited the strongest commendation.

Travelling agents were necessary to apprise people of their opportunities, and induce them to act as policy holders and premium payers, under the name of " the insured." Such emissaries were sent out. " The soliciting agents of insurance companies swarm through the country, plying the inexperienced and unwary, who are ignorant of the principles of insurance law, and unlearned in the distinctions that are drawn between legal and equitable estates." *Combs* v. *Hannibal Savings and Ins. Co.*, 43 Mo. 148, 152—6 Western Insurance Review 467, 529. The agents made personal and ardent application to people to accept policies, and prevailed upon large numbers to sign papers (represented to be mere matters of form) falsifying an important fact by declaring that they made application for policies, reversing the first material step in the negotiation. An insurance company, by its agent, making assiduous application to an individual to make application to the company for a policy, was a sample of the crookedness characteristic of the whole business.

When a premium payer met with a loss, and called for the payment promised in the policy which he had accepted upon the most zealous solicitation, he was surprised to find that the voluminous, unread, and unexplained papers had been so printed at head-quarters, and so filled

out by the agents of the company, as to show that he had applied for the policy. This, however, was the least of his surprises. He was informed that he had not only obtained,the policy on his own application, but had obtained it by a series of representations (of which he had not the slightest conception), and had solemnly bound himself by a general assortment of covenants and warranties (of which he was unconscious), the number of which was equalled only by their variety, and the variety of which was equalled only by their supposed capacity to defeat every claim that could be made upon the company for the performance of its part of the contract. He was further informed that he had succeeded in his application by the falsehood and fraud of his representations,—the omission and misstatement of facts which he had expressly covenanted truthfully to disclose. Knowing well that the application was made to him, and that he had been cajoled by the skilful arts of an importunate agent into the acceptance of the policy and the signing of some paper or other, with as little understanding of their effect as if they had been printed in an unknown and untranslated tongue, he might well be astonished at the inverted application, and the strange multitude of fatal representations and ruinous covenants. But when he had time to realize his situation,—had heard the evidence of his having beset the invisible company, and obtained the policy by just such means as those by which he knew he had been induced to accept it, and listened to the proof of his obtaining it by treachery and guile, in pursuance of a premeditated scheme of fraud, with intent to swindle the company in regard to a lien for assessments, or some other matter of theoretical materiality, he was measurably prepared for the next regular charge of having burned his own property.

With increased experience came a constant expansion of precautionary measures on the part of the companies. When the court held (*Marshall* v. *C. M. F. I. Co.*, 27 N. H. 157, *Campbell* v. *M. & F. M. F. I. Co.*, 37 N. H. 35, *Clark* v. *U. M. F. I. Co.*, 40 N. H. 333) that the agent's knowledge of facts not stated in the application was the company's knowledge, and that an unintentional omission or misrepresentation of facts known to the company would not invalidate the policy, the companies, by their agents, issued new editions of applications and policies, containing additional stipulations, to the effect that their agents were not their agents, but were the agents of the premium payers ; that the latter were alone responsible for the correctness of the applications; and that the companies were not bound by any knowledge, statements, or acts of any agent, not contained in the application. As the companies' agents filled the blanks to suit themselves, and were in that matter necessarily trusted by themselves and by the premium payers, the confidence which they reposed in themselves was not likely to be abused by the insertion in the applications of any unnecessary evidence of their own knowledge of anything, or their own representations, or their dictation and management of the entire contract on both sides. Before that era, it had been understood that a corporation,—an artificial being, invisible, intangible, and exist-

ing only in contemplation of law,—was capable of acting only by agents. But corporations, pretending to act without agents, exhibited the novel phenomena of anomalous and nondescript as well as imaginary beings, with no visible principal or authorized representative; no attribute of personality subject to any law, or bound by any obligation; and no other evidence of a practical, legal, physical, or psychological existence than the collection of premiums and assessments. The increasing number of stipulations and covenants, secreted in the usual manner, not being understood by the premium payer until his property was burned, people were as easily beguiled into one edition as another, until at last they were made to formally contract with a phantom that carried on business to the limited extent of absorbing cash received by certain persons who were not its agents.

When it was believed that things had come to this pass, the legislature thought it time to regulate the business in such a manner that it should have some title to the name of insurance, and some appearance of fair dealing; and the act of 1855 was passed for that purpose.

The loss of the time occupied by the solicitations of insurance agents, the loss of premiums and assessments paid, the loss of insurance security, the vexation and costs of lawsuits lost upon the astute and technical character of applications and policies not understood by the premium payers, the manner in which innocent and deluded persons were overwhelmed by an array of their theoretical misrepresentations and constructive frauds, and other misfortunes incident to the system, were believed to constitute a crying evil, and a mischief of great magnitude. (Whether any remedy was available at common law or in equity, upon higher grounds and broader views than were taken— *U. M. L. Ins. Co.* v. *Wilkinson*, and note on that case in 11 Am. Law Reg. (N. S.) 485—we need not, in this construction of statutes, stop to consider.) When the premium payer complained that he had been defrauded, it was not, in the opinion of the legislature, a sufficient answer to say that, if he had been wise enough, taken time enough, had good eyes enough, and been reckless enough in the use of them to read the mass of fine print, and had been scholar, business man, and lawyer enough to understand its full force and effect, he would have been alarmed, and would not have been decoyed into the trap that was set for him. Men have a right to be dealt with with some regard for the state of mind and body, of knowledge and business, in which they are known actually to exist. Whether they ought to be what they are, or not, the fact is, that, in the present condition of society, men in general cannot read and understand these insurance documents. Whether it be reliance upon the representations of the companies' agents, or want of taste for literary pursuits and critical exegesis, or defect of legal attainments, or press of business, or fatigue of daily labor, or dislike of insurance typography,—whatever the cause may be, the fact is, that, under the ordinary circumstances of the present order of things, these documents are illegible and unintelligible to the generality of mankind. And it seemed to the legislature that the companies who

sent out their agents, knowing they would be confided in by the premium payers to transact the business properly, and who issued applications and policies which' they knew would not be understood, should not take an unfair advantage of mistakes into which the companies themselves, by their agents and their fine print, caused the premium payers to innocently and unconsciously fall. The action of the legislature was certainly in harmony with, if, indeed, it was anything more than an affirmance of, the common law (in relation to fraud, estoppel, and trust), which will not hear a man complain that he has led his neighbor into a pit. .It was also thought that insurance companies, in danger of being defrauded by the premium payer's burning his own property, were required, by their private interest and their public duty, to see to it that they did not insure his property to such an amount as to lead him into temptation ; and that their devices were not a prevention of, nor an appropriate protection against, the fraudulent incendiarism propagated throughout the country by excessive amounts of pretended insurance.

As the distress of those who met with losses was not alleviated by the eminent respectability of the men whose names figured as officers of the companies, so it was the nature of a system so liable to abuse, and not the character of the nominal or real managers of the companies, that was supposed to call for the interference of the legislature. With no fault in many, and probably with substantial fault in but a few, the system came to be excessively odious: it was believed there had seldom been so flagrant an abuse of corporate power.

The act of 1855 cut up a considerable part of the supposed evil by the roots. Upon a full trial of the remedy, from 1855 to 1862, it seemed to answer the high expectations that had been formed of it, and was perfectly satisfactory to the people of the State. In this state of things the defendants claim that, by the special act of 1862, in addition to the defendants' charter, the legislature abolished the remedy, not generally, in favor of all insurance companies, but by an exception in favor of this company alone, leaving the public securely guarded against all other companies, and giving to this company alone the legal right to take advantage of an innocent mistake, which right (if it ever existed) the legislature had taken away from this company and all other companies seven years before. It is not to be presumed that the legislature, of their own motion, passed the act of 1862 in ignorance of its tenor and practical effect, or that this company fraudulently procured its passage. No reason is suggested to show why the legislature should revive the evil which they had explicitly abolished—abolish the remedy which was thought to be perfectly indispensable, and, after a thorough trial of seven years' duration, had been found perfectly successful—and give this company a monopoly of insurance fraud. What great and conspicuous benefits these defendants had conferred upon the State; what enormous and exceptional service' this particular company was to render the public, over and above all other companies engaged in the same business ; in what respect it was so peculiar an institution

as to be selected for distinguishing marks of public favor, and loaded with the bounty and perpetual pension and franchise of defrauding the whole community,—on this subject, history, as well as the act of 1862, is silent, and conjecture fails. Until some explanation is given, the presumption must be almost irresistible that the legislature did not do what the defendants claim they did.

. It is not for the court to legislate by constraing an act to be what they think it ought to be; but, in ascertaining the meaning of the act of 1862, by the settled rules of construction, it is our duty to give due weight to the history of all the legislation on the subject-matter of the act, and the reason and policy of the general law of the land, in connection with which the special act of 1862 is to operate. The presumption which we have found, arising upon considerations of this kind, is not absolutely irresistible and conclusive, because it would be possible for the legislature to use language sufficiently explicit to leave no room for doubt of their intent to do what the defendants claim they did. If the legislature had passed a general act, saying, in so many words, "The act of 1855, chapter 1662, is hereby repealed," there would have been no question what that meant. If, instead of a general act of that kind, there had been a special act, explicitly declaring that policies issued by this company should be void by reason of innocent mistakes of the premium payers, and that this company should be exempted from the operation of the sixth section of the act of 1855, we might be compelled to admit that the legislature intended not only to expose the community to an unnecessary danger of fraud, but also to violate those principles of free government which require laws, as far as practicable, to be general, equal, and uniform, and prohibit unjust discriminations and monopolies.

It is not claimed that the general act of 1855 was repealed, but it is claimed that this company was exempted from the operation of the sixth section of that act. The general drift of the constitution is distinctly hostile to the creation of discriminating and unreasonable privileges and immunities; the declaration of Article X of the Bill of Rights, that government is instituted for the common benefit, protection, and security of the whole community, and not for the private interest or emolument of any one man, family, or class of men, is plain and explicit; and the declaration of Article XXXVI, that a pension should be granted with great caution, and only in consideration of actual services, and never for more than one year at a time, is very significant. And it is difficult to overestimate the weight of the natural presumption that the legislature did not intend either to pass an act that would be void, because evidently a breach of constitutional obligations, or to pass one that would so far indirectly defy the general spirit of the paramount law,—though not in direct, open, and violent conflict with any of its specific provisions,—as to be of doubtful validity. It is always to be presumed—and the presumption is to stand until the contrary is shown by an immense preponderance of evidence —that the legislature have not intended to disregard the doctrine of

equal rights, upon which our institutions were founded. Whether every possible application of that doctrine is guaranteed in express terms in the constitution, or whether some applications of it are necessarily to be inferred from the general tone and temper of that instrument, and its comprehensive declarations of the doctrine, it is extremely improbable that a legislature, presumed to be well affected to free institutions in theory and practice, have intended, by an application, of the doctrine of unequal rights, to build on some other foundation than that laid by competent authority.

It would be a serious misfortune if, by construing the constitution strictly in its general direction, and liberally in other directions, or by adopting any arbitrary rule or eccentric habit of construction, it were rendered necessary to constantly amend the constitution by inserting such specific guaranties as would be, in fact, mere applications of the general principles of the original instrument to changed circumstances and new conditions of society. Such a custom of amendment would propagate erroneous ideas of the original, break the uniformity and shake the permanency of its principles, and materially impair its efficacy. If the court should hold that the legislature intended to make unreasonable discriminations and to establish unreasonable franchises, not for the common benefit, protection, and security of the whole community, but for the private interest or emolument of some one man, family, or class of men, and should further hold that the legislature had the power to do this, in any case not within the condemnation of some constitutional provision more explicit than Article X of the Bill of Rights, the government would be turned into a course not designed by its founders. Standing on the presumption of a legislative intent to support the spirit as well as the letter of the constitution, the court is not justified in holding, upon any light grounds, that the legislature have carelessly, unintelligently, or in bad faith, discharged the duty forcibly called to their attention by their official oath ; and when a statute is fairly and reasonably capable of a construction consistent with the doctrines of the constitution, it must ordinarily, if not always, be the duty of the court to give it that construction.

Upon a just consideration of the province of construction as the discovery of the legislative intent, the history of legislation on the subject-matter of the third section of the private act of 1862, the reason and policy of the general act of 1855, the mischief which the act of 1855 was designed to remedy, and the presumption that the legislature passed the act of 1862 with a becoming regard for constitutional principles, the defendants' construction of that act is extremely unreasonable. A different construction must be very unreasonable indeed to prevent its being adopted in preference to the defendants'.

The title of the act of 1862 is, "An act in addition to an act to incorporate the Rockingham Farmers' Mutual Fire Insurance Company,"— not a word indicating a purpose to amend the act of 1855, entitled "An act in relation to insurance companies," but every word indicating a purpose to amend the charter of this company, passed in 1833. A

material modification of or exception to the general law would naturally be put in a general act, and not in a private one, which would not be likely to be published in revisions of the statutes. An important amendment of a general act inserted in a private one, with nothing in the title of the latter suggesting the amendment, is not according to the usual course of legislation in this State. Not only is there nothing in the title of the act of 1862 suggesting an amendment of the act of 1855, but in the body of the former act there is no allusion to the latter; and, from a perusal of the private act alone, no one would suspect that it modified, or introduced an exception to, any general act whatever. If the legislature had intended, by the private act, to make so serious a change in the general law of insurance as to exempt one insurance company from its operation, there is some reason to expect they would have explicitly referred to the general law, or used, in the title or body of the private act, some express words of exemption or exception. But, while the seventh section of the amendatory act is, "The fifth and seventh sections of the act to which this is in addition are hereby repealed," the general clause repealing all acts and parts of acts inconsistent with this act, which clause was inserted in the act of 1855, and is usually inserted in all acts supposed to be repugnant to existing statutes not particularly repealed, was omitted in the act of 1862.

The third section of the act of 1862 is a substitute for the repealed seventh section of the charter, which provided " that the said company may make insurance for any term not exceeding seven years ; and any policy of insurance issued by said company, signed by the president, and countersigned by the secretary, shall be deemed binding on said company in all cases."

The third section of the act of 1862 provides " that said company may make insurance for any term not exceeding seven years ; and any policy of insurance issued by said company, signed by the president, and countersigned by the secretary, shall be deemed valid and binding on said company in all cases where the assured has a title, in fee simple, unincumbered, to the building, buildings, or property insured, and to the land covered by said buildings ; but if the assured have a less estate therein, or if the [property or premises are incumbered, policies shall be void, unless the true title of the assured, and the incumbrances on the same, be expressed therein."

A literal construction of the repealed section would have made every policy " binding on said company," that had been " issued by said company, signed by the president, and countersigned by the secretary." A literal construction of the substituted section would make every such policy " valid and binding on said company," where the title of the assured is " in fee simple, unincumbered." No construction could be more unreasonable or more unacceptable to the defendants than that. There were many cases where policies " issued by said company, signed by the president, and countersigned by the secretary," would have been void under the repealed section ; and there are many cases where

such policies would now be void under the substituted section, even if the title of the assured were "in fee simple, unincumbered." The literal construction of either section is wholly inadmissible. The repealed section would be held to operate in harmony with and in subjection to the general law applicable to duly executed policies of insurance. Such a qualification was necessarily implied and understood. And, to a great extent, the defendants would of course claim that the substituted section should be taken with the same qualification. But the defendants claim that no such qualification can be attached to the express provision that policies shall be void when the assured has a less estate than a fee simple, unincumbered, unless his true title is expressed in the policy; and it is argued that such a qualification would render that provision nearly a nullity, and would conflict with the purpose of the lien (given by the preceding section) on the property insured, for assessments. Forcibly as the defendants' argument is presented, it seems to us to be overcome by the reasons for the contrary conclusion, which we have considered. Due weight being given to all the reasons on both sides of the question, the qualification, necessarily implied in the repealed section, making policies valid, not in all cases, according to the literal terms of that section, but in all cases where duly executed policies would be valid by the general law,—which qualification is also necessarily implied in the substituted section "in all cases where the assured has a title in fee simple, unincumbered,"—must, we think, also be implied in the latter section, in cases where the assured has not such a title. The implied qualification is in the repealed section and in the substituted section; and, on the grounds already stated, we think it must be held to apply to all cases under the latter section, as it applied to all cases under the former.

This construction undoubtedly leaves the substituted section open to the criticism of not being a very felicitous composition, or a very important amendment; but the opposite construction would expose it to objections far more serious than infelicity of style and immateriality of substance. A literal construction makes the act of 1862 repugnant to the act of 1855; but the repugnancy is removed by applying to all cases the qualification which must be applied to many cases; and it is much easier thus to remove the repugnancy than to remove the objections to the construction which raises it.

The defendants further claim, that the act of 1862 being made a part of the contract, the plaintiff is bound by it as by a waiver of the act of 1855. But, if it is binding upon him as a part of the contract, it is binding in accordance with its legal construction, which, as we hold, makes it operate in harmony with, and subject to the general law under which the plaintiff's policy is not "void by reason of any error, mistake, or misrepresentation, unless it shall appear to have been intentionally and fraudulently made." The third section of the act of 1862 did not exempt the defendants, in any case, from the operation of the sixth section of the act of 1855.

*Judgment for the plaintiff.*

HIBBARD, J. I concur in the result which is reached in the foregoing opinion, but do not think it can be sustained upon the ground stated. It seems to me that, upon a true construction of the plaintiff's application, the insurance was not on the whole house, but on the undivided half which the plaintiff owned in fee simple, the value of which was found by the jury to be more than sufficient to justify the sum insured upon it. If this view is correct, the question, so ably discussed in the opinion, does not arise. The provisions of the application which tend to favor this construction are not contained in the statement of facts preceding the opinion ; and it would not be useful to occupy space in reciting or considering them, nor in assigning reasons for disagreeing with the doctrine of the opinion.